KOESTLER, et al. v. BURTON.

In Banc. June 13, 1949.

No. 37154. (41 So. (2d) 362)

42

**Culkin & Chaney,** for appellants.

Vollor, Teller & Biedenharn, for appellee.

McGehee, C. J.

This appeal is from a judgment in the sum of $5,000 as damages for personal injuries sustained by the appellee, Eugene Burton, rendered against the appellants, Koestler' Bakery, a partnership, and Shelby R. Peck, as driver of a bakery truck with which the plaintiff's automobile collided when the truck is alleged to have

come to a sudden stop on the paved portion of the highway and caused the injuries complained of.

Numerous grounds of error are assigned for a reversal of the cause, but the arguments contained in the briefs and made at the bar are devoted primarily to the following questions: First, whether the trial court was in error in denying a continuance of the case on motion of the defendants; second, whether the verdict in favor of the plaintiff was supported by sufficient evidence to establish negligence on the part of the defendants, or was at least against the overwhelming weight of it; third, whether or not the action of the trial court constitutes reversible error in admitting in evidence the photograph of the plaintiff taken some five years prior to the time of the accident, showing that at such time his face and features were not disfigured in the manner shown at the time of the trial; fourth, whether or not the amount of the verdict is so grossly excessive as to evince passion and prejudice on the part of the jury against the defendants; and fifth, in its ruling on certain instructions hereinafter mentioned.

The cause came on for trial at the February 1948 term of the Circuit Court of Warren County. The leading counsel for the defendants was then busily engaged with his legislative duties as a member of the State Senate from said county, and because thereof an application for continuance of the case until the April 1948 term of the court was made on February 9, 1948, and prior to the call of the case on February 12, 1948. The application was overruled, ██ and on February 12, 1948 an order was entered by the court which recited, in substance, that the Senator had made it known to the court that he was then indisposed, and that "the court and counsel for all of the litigants being agreeable for early disposition of this cause in vacation, it is therefore, by the court, with the consent of counsel for the litigants", ordered that the cause be set for trial Thursday, February 19, 1948. We are of the opinion, therefore, that even though it may

have been proper for the court in the exercise of its discretion to continue the cause until the April term, there was no reversible error committed in failing to do so, and especially in view of the recitals contained in the order of the court of February 12, 1948, as above shown.

Upon the trial of the case on the merits there were substantial conflicts in material particulars in testimony offered by the plaintiff and by the defendants. Under the conflicting evidence, the jury was warranted in finding that the plaintiff was following the driver of the bakery truck in the right lane of a paved highway, twenty feet in width, travelling northward on a mile stretch of straight road through a residential section along the highway and where there were six feet of gravelled way on the right or east side of the pavement, and that he negligently came to a sudden stop thereon, after proceeding about two-thirds of the length of the straight way, without giving to the plaintiff a proper warning and opportunity to avoid a collision with the bakery truck.

The evidence is in substantial conflict as to the respective rates of speed at which the two vehicles were being operated immediately prior to the accident. The maximum rate of speed authorized by law at the place of the accident is twenty-five miles per hour. The driver of the bakery truck testified that he stopped the truck to permit a companion to alight therefrom near the latter's home, and that he was only travelling ten or fifteen miles per hour while coming almost to a full stop, but not to a complete stop, whereas the plaintiff and two or three witnesses who appeared to have been wholly disinterested, testified that both vehicles were travelling at about thirty-five or forty miles per hour when the bakery truck came to a sudden stop on the highway, causing the collision.

The testimony was also conflicting as to the distance which separated the two vehicles after they both came to a stop. The testimony on behalf of the plaintiff showed that they were about three feet apart, or from three to

five feet apart, whereas the testimony on behalf of the defendants showed that they were approximately twenty-five feet apart, the theory of the driver of the bakery truck being that the plaintiff's automobile struck his truck which was approximately forty feet long, including the trailer, and nearly eight feet wide and seven feet high in so far as the front section was concerned, and knocked the same forward a distance of approximately twenty-five feet. The plaintiff was driving a 1939 model Ford coupe.

The witnesses for the plaintiff say that both vehicles were travelling at about the same speed, thirty-five or forty miles an hour, immediately prior to the accident. Section 8141(b), Code 1942, defines a residence district, and the proof shows that the territory contiguous to this highway at the point of the accident came within such definition. Section 8176, Code 1942, provides that no person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing, and further provides a maximum rate of speed of twenty-five miles per hour in any residential district.

Section 8192(c), Code 1942, provides "No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided hereinafter to the driver of any vehicle immediately to the rear when there is opportunity to give such signal."

Section 8193, Code 1942, provides: "The signals herein required shall be given either by means of the hand and arm or by a signal lamp or signal device of a type approved by the (vehicle) department, but when a vehicle is so constructed or loaded that a hand and arm signal would not be visible both to the front and rear of such vehicle then said signals must be given by such a lamp or device."

Section 8252, Code 1942, provides that "Every motor vehicle which is so constructed or loaded as to obstruct the driver's view to the rear thereof from the driver's

position shall be equipped with a mirror so located as to reflect to the driver a view of the highway for a distance of at least two hundred feet to the rear of such vehicle."

The driver of the bakery truck admitted that he did not give a signal by hand, for the reason that it could not have been seen, and especially at one o'clock a. m. when this accident occurred; but he further testified that his truck was equipped with the proper mirrors. He said, however, that he did not see the plaintiff's automobile to his rear prior to the accident.

The testimony was conflicting as to whether or not the proper lamp signal or stop light was being displayed at the time of the accident, but it appears that the preponderance of the evidence may support the contention of the truck driver that all proper lights and signals were burning. However, this was a question for the jury, and under all the facts and circumstances testified to by the witnesses, the jury had sufficient evidence upon which to base its finding that the driver of the bakery truck was negligent in stopping on the paved portion of the highway in the manner testified to by the plaintiff and his witnesses, and in such a manner as not to afford the plaintiff a sufficient time to avoid the collision. See Hill v. Knight et al., La. App., 163 So. 727, Collins Baking Co. v. Wicker, 166 Miss. 264, 142 So. 8, Gulf Refining Co., et al. v. Brown, 196 Miss. 131, 16 So. (2d) 765, on the question as to whether or not the instant case was entitled to be submitted to the jury on the question of liability. We are unable to say that the verdict was contrary to the great weight of the evidence.

As to the third ground relied upon for a reversal, we are of the opinion that under the rule to be deduced from the reported cases to the effect that a plaintiff who has sustained personal injuries may not recover as an element of damages any disfigurement of his person as a permanent impairment of his physical appearance, it was error for the trial court to have permitted the introduction of the photograph of the plain-

tiff in the instant case which was taken about five years prior to the accident, although the writer of this opinion and other members of the Court are unable to see why such a rule should have ever become announced as to the elements of damage to be assessed in a personal injury case, it often being true that disfigurement of the person, and especially the mutilation of one's face, is the only permanent impairment and serious injury suffered by a plaintiff after his physical pain and suffering following an accident is at an end. However, we are bound by the rule as long as it may continue to be supported by the prior decisions of this and other courts, without regard to whether or not it be supported by any good reason. Cf. 20 Am. Jur. Sec. 732, p. 611, on this question.

But in view of the fact that the only effect of the introduction of the photograph in question would have been to emphasize that there was no disfigurement of the person of the plaintiff prior to the accident—a fact that the jury should have necessarily found in any event from all the testimony in the case as given by the two physicians as to the nature of the injuries received on the occasion complained of—its introduction in evidence went only to the quantum of damages sustained, and we are unable to say that the error would amount to a reversible one, since, in our opinion, when the fact is considered that the plaintiff had a medical and hospital expense of approximately $1500 and that he suffered the physical pain and mental anguish that was shown to have resulted from his injuries, the amount of the verdict was not so grossly excessive as to show passion, prejudice or bias on the part of the jury, if excessive at all, even though the instruction granted unto the defendants on comparative negligence may have been properly given and was taken into consideration by the jury in arriving at its verdict.

This brings us to a summary of the testimony as to the extent of the injuries sustained by the plaintiff.

Dr. Morris testified that "The X-rays showed a fracture of the skull in this region (indicating). This was a compound fracture; that is, the skin and tissue covering the bone was cut down to the bone; . . . The X-ray revealed a fracture of the jaw; that is, you could take his upper teeth and move them up and down, proving that he had a fracture across the face in this region. The X-ray showed that this fracture was between the maxillary, or upper jaw, and the frontal bone of the skull on both sides, making it possible to move the upper jaw like I said. He further had lacerations of both knees. The left knee had a particularly ragged laceration, about six inches long, and the laceration of the right knee was about one and a half inches long, transversely, and was fairly clean. He was taken to surgery after the X-rays were made, and treatment consisted of trimming away the soiled tissue and trimming away the devitalized tissue, and repairing these cuts, and the emergency treatment consisted of fixing the fracture of the upper jaw. This was done by making incisions above the eye, exposing the bone, drilling holes in the bone above the eye, tying a wire in these holes in the bone and around on the teeth inside the mouth. This wire was not on the outside; it was put under the skin with a nail beneath the bone. . . . I imagine he was in surgery about two hours and a half. On the following day it was noted that his teeth wouldn't close properly, like this (indicating). Because of that occlusion, the upper teeth were held up too high. It was necessary then to put hooks on the upper and lower teeth, fastening these hooks together with rubber bands. . . .

"Q. (interposing) How did you put these hooks on the teeth? A. You do it by wiring about the teeth with smaller wire on a larger wire hook, and the hooks are made by bending the wire into successive U shaped fingers and turning the prong of the U up or down, depending on what jaw it is on, and the wire hooks are laced on the teeth, say, especially like shoes, with smaller wire.

This was done on the morning of the third day. This was done with morphine, for a pre-anesthetic for dulling the pain. The patient's condition was very satisfactory; that is, considering the extent of his injuries. . . .

"Q. (interposing) One thing I would like to ask you; why did you use morphine instead of a general anesthetic? A. It had been just one day since he had a prolonged general anesthetic, and he had a compound skull fracture, and it was deemed somewhat of a risk to give him a second anesthetic within twenty-four hours of the first anesthetic, and it is not uncommon that you can do it without an anesthetic; it is about 50-50; you do it sometime with an anesthetic and sometime without an anesthetic. His condition was progressing satisfactorily, and on the 10th day he was operated on originally, he was treated by Dr. Edwards, by operating on his nose, because it was impossible to treat the jaw without treating the nose. During the whole time the patient was in the hospital, he received penicillin except for the last three days, and he was discharged from the hospital three weeks after admission, three weeks and two days after admission. The day before he was discharged, the incision above the eyes were re-opened and the wire through this bone in the forehead to the upper jaw inside the mouth were removed, and the wires on his teeth, with the rubber bands on them, were removed too. He reported back to the Clinic in about a week. His condition at that time was still satisfactory, except that incision above the right eye was infected. This was draining a small amount of pus, and this continued to drain until the last time I saw him, as a patient, on the 24th of November. It was still draining, but it was much better. It had developed a cellulitis, and this was treated with penicillin in oil and wax on two occasions, and he was improving, and it had practically stopped draining when I saw him last, the last time I saw him as a doctor.

"Q. From the day of his admission on October 1 until a couple of days before his discharge, or a period of about three weeks, he had these wires holding his jaw up? A. Right, and he also had a fractured nose, for which Dr. Edwards treated him.

"Q. Before that fracture was cured, could he breathe out of his nose or was that obstructed? A. It was obstructed by Dr. Edwards putting packs in his nose; it was completely obstructed."

Dr. Edwards testified, in substance, as to the crushing injury to the plaintiff's nasal bones, of the depressed fracture of those bones, of the multiple fragments therein, of the operation, of the packing necessitated; that the vision test of his eyes instead of being 20-20 was 20-50 in the right eye and 20-60 in the left eye; that he didn't know what the patient looked like before the accident, but that he virtually had no nose as a result thereof, and that he had fixed him up with a pretty good nose by means of the corrective measures undertaken in the operation, and that the patient had only 20-40 vision the last time that he saw him; that people can get along with 20-40 vision "but if they are used to 20-20 they won't stand 20-40". The plaintiff was an ex-marine and was presently planning to enter the Foreign Service at the time of the accident.

It was shown on behalf of the plaintiff that he had difficulty in breathing; lost thirty pounds in weight; that he had two ribs broken; that his teeth continued to be out of alignment and do not meet properly in the rear or front; that he had developed a lisp in his speech; that he still has frequent headaches; and that his eyesight is not now good.

The following instruction as to the elements of damage that were to be considered by the jury is assigned as error, to wit:

"The Court instructs the jury for the Plaintiff that if your verdict is for the Plaintiff you should, in fixing the amount to be awarded to him, take into consideration

all damages which the evidence shows the Plaintiff has suffered or sustained as a direct result of the accident on or about October 1st, 1947. You should take into consideration all physical injuries sustained by the Plaintiff, as shown by the evidence, and the permanent impairment, if any, to the Plaintiff as a result of such physical injuries and the physical suffering and the mental anguish which you may believe from the evidence the Plaintiff has suffered, or will sustain, and, in addition, all outlays which the Plaintiff has made and all obligations which the Plaintiff has incurred, as a result of the injuries which he received. In short, the Court tells you that you should consider all damages and loss of every kind which the evidence shows the Plaintiff has sustained and will suffer as a direct result of the injuries testified to growing out of the accident on or about October 1st, 1947; the exact amount of such damages cannot be wholly proven in dollars and cents, but is largely in your discretion, and in fixing the amount to be awarded to the Plaintiff by way of such damages you should be governed by the application of your sense of justice and right to the facts of this case and award to the Plaintiff such damages as you may believe, under all of the evidence, he is entitled to receive.''

It will be noted that this instruction is not a peremptory one, but is prefaced by the words ''if your verdict is for the Plaintiff you should'' etc. Further, it will be noted that the jury was told to take into consideration ''the permanent impairment, if any, to the Plaintiff . . . and the loss of every kind which the evidence shows the Plaintiff has sustained and will suffer as a direct result of the injuries testified to'', and that the amount of such damages ''is largely in your discretion'' and that ''you should be governed by the application of your sense of justice and right to the facts of this case and award to the Plaintiff such damages as you may believe, under all of the evidence, he is entitled to receive''.

The "permanent impairment" referred to in the instruction was proper to be considered by the jury in view of such impairment of the plaintiff's vision, speech, the malocclusion of his teeth, and broken bones. And it will be noted that wherein the jury is told in this instruction to apply their "sense of justice and right to the facts of this case", the application was to be "under all the evidence".

While we do not approve the instruction in full as written either as to form or substance, and while it may be conceded that the submission of "permanent impairment" for the consideration of the jury may have authorized the jury to consider the physical disfigurement and altered facial appearance of the plaintiff, we do not feel justified in reversing the case on that account in order that there be a reassessment of damages, for the reason that under the foregoing testimony in regard to the extent of the injuries received, we are unable to say, with confidence, that the verdict is excessive, or that any other jury could reasonably be expected to render a verdict for a less amount. If the verdict had been for $10,000 or more, a different question would be presented.

Finally, it is complained that the trial court was in error in refusing an instruction requested by the defendants to the effect that the plaintiff was operating his automobile at a greater rate of speed than twenty-five miles per hour, and that this rate of speed was prima facie negligence. ██ █ The defendants were entitled to this instruction, except for the fact that they had already obtained an instruction of similar import which advised the jury that one who operates an automobile over a highway, in a residential district, at a greater speed than twenty-five miles per hour is guilty of negligence. The plaintiff and his witnesses had testified that he was driving his automobile at a greater rate of speed than twenty-five miles per hour at the time of the accident, and the jury was therefore peremptorily instructed that the plaintiff was negligent. But this did not constitute the sole,

proximate cause of such accident, and the refusal of the instruction above mentioned was cured by the giving of one to the defendants of such similar import.

The verdict and judgment in favor of the plaintiff must, therefore, be affirmed.

Affirmed.